UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
AUSTRIA BUENO,

                     Plaintiff,

      -against-

THE CITY OF NEW YORK,

                     Defendant.
------------------------------------------------------------------x

Civ.

COMPLAINT

## PRELIMINARY STATEMENT

1. Using a decades-old law that was created to close strip clubs and sex shops in Times Square, New York City is unlawfully locking innocent families out of their homes without prior notice or proper process—forcing the elderly, disabled and children onto the streets without clothing, food, life-saving medicine or personal belongings. Some lockouts last days; many can last weeks or months, and in some cases families lose their home permanently.[1]

2. The City uses nuisance abatement lockouts almost exclusively in low-income communities of color. According to a recent study published by the non-profit website ProPublica and the New York Daily News, over 85% of nuisance abatement actions filed in a recent 18-month period were in New York City neighborhoods where 80% or more residents are non-white.[2]

---

[1] *See* Elise Bernlohr, *No Better Instrument: The Necessity of Notice and Opportunity to Be Heard and the Due Process Deficiencies of Nuisance Abatement Law in New York City*, Cardozo L. Rev. Vol.37:1093 (Feb. 2016).
[2] *See* Sarah Ryley, *The NYPD Is Kicking People Out of Their Homes, Even If They Haven't Committed a Crime*, Pro Publica and the N.Y. Daily News (Feb. 4, 2016), https://www.propublica.org/article/nypd-nuisance-abatement-evictions; *see also*, Sarah Ryley,

3. The New York City Police Department (NYPD) initiates a so-called "nuisance abatement" action by filing allegations of improper conduct before a civil court judge. The City does not provide any notice to the impacted landlord or tenant, nor does the City investigate whether or not the person accused of the improper conduct is still occupying the home. The granting courts are not required to hold any hearing, and approve the NYPD's request in a majority of cases.

4. Although applications for lockout orders are supposed to be based on the existence of dire emergency conditions, NYPD typically waits five to six months after the last criminal incident at the premises before appearing in court and telling the judge that public safety requires the immediate sealing of the apartment.

5. Plaintiff Austria Bueno provides a vivid example of the pernicious effects of NYPD's unconstitutional procedures. Ms. Bueno is a housekeeper. Her husband works at a deli. They have two young sons, who are 6 and 15 years old. Last August, after a long application process, Ms. Bueno and her family were approved to move into a New York City Housing Authority (NYCHA) apartment.

6. This past December, while Ms. Bueno was picking up her son from the local elementary school—and with the family's dinner left in the apartment—the City of New York locked Ms. Bueno and her family out of their Queens apartment.

---

*Insiders Say NYPD's Nuisance Unit Skirts the Law and Relies on Unconfirmed Allegations*, Pro Publica and the New York Daily News (Mar. 25, 2016), https://www.propublica.org/article/insiders-say-nypd-nuisance-unit-skirts-law-unconfirmed-allegations

7. Terrified, homeless and without access to any personal belongings, Ms. Bueno and her family were forced to seek temporary lodgings.

8. The City locked Ms. Bueno out based upon the alleged nuisance activity of the apartment's previous occupants, with whom Ms. Bueno had no connection whatsoever.

9. Ms. Bueno was forced to forego several days of work and wages to fight the lockout; her son missed school and the family was deeply traumatized by the City-imposed homelessness.

10. Ms. Bueno files this action to seek a judgment declaring that the Public Nuisance Law, N.Y.C. Admin. Code 7-701 *et seq.,* which authorizes the eviction of residential tenants by means of *ex parte* orders, is unconstitutional as applied to the facts herein, and that the City's pattern and practice of seeking such *ex parte* orders based upon grossly inaccurate and misleading representations to the State courts violates the Due Process Clause.

11. Ms. Bueno further seeks damages to compensate her for the deprivation of her Constitutional rights.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

13. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to the claims herein occurred in this district.

## PARTIES

14. Plaintiff, AUSTRIA BUENO, resides at 41-06 12th Street, Apt. 4D, Long Island City, New York 11101.

15. Defendant, THE CITY OF NEW YORK, is a municipal corporation duly incorporated

and existing pursuant to the laws of the State of New York. The office of

Corporation Counsel is located at 100 Church Street, New York, New York 10007.

## STATUTORY AND REGULATORY SCHEME

### The NYC Nuisance Abatement Law

16. The Nuisance Abatement Law, N.Y.C. Admin. Code § 7-701 *et seq.,* (hereinafter "the

Statute") was enacted by the N.Y. City Council based on its finding

that public nuisances exist in the city of New York in the operation of certain
commercial establishments and the use or alteration of property in flagrant
violation of the building code, zoning resolution, health laws, multiple dwelling
law, penal laws regulating obscenity, prostitution and related conduct, licensing
laws, environmental laws, laws relating to the sale and consumption of alcoholic
beverages, laws relating to gambling, controlled substances and dangerous drugs
and penal laws relating to the possession of stolen property, all of which interfere
with the interest of the public in the quality of life and total community
environment, the tone of commerce in the city, property values and the public
health, safety, and welfare

17. The Statute includes in its definition of "public nuisance" buildings in which,

within the period of one year prior to the commencement of an action under this
chapter, there have occurred three or more violations of one or any combination of
the provisions of article two hundred twenty, two hundred twenty-one or two
hundred twenty-five of the penal law; [i.e. offenses involving controlled
substances].

N.Y.C. Admin. Code § 7-703(g).

18. The Statute authorizes the City to apply for a preliminary and permanent injunction

enjoining the existence of a nuisance:

Pending an action for a permanent injunction as provided for in section 7-706 of
this subchapter, the court may grant a preliminary injunction enjoining a public
nuisance within the scope of this subchapter and the person or persons
conducting, maintaining or permitting the public nuisance from further
conducting, maintaining or permitting the public nuisance. An order granting a

4

preliminary injunction shall direct a trial of the issues within three business days after joinder of issue or, if issue has already been joined, within three business days after the entry of the order. Where a preliminary injunction has been granted, the court shall render a decision with respect to a permanent injunction within three business days after the conclusion of the trial.

    N.Y.C. Admin. Code § 7-707.

19. The Statute further provides that

a temporary closing order may be granted pending a hearing for a preliminary injunction where it appears by clear and convincing evidence that a public nuisance within the scope of this subchapter is being conducted, maintained or permitted and that the public health, safety or welfare immediately requires the granting of a temporary closing order. A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears by clear and convincing evidence that a public nuisance within the scope of this subchapter is being conducted, maintained or permitted.

    N.Y.C. Admin. Code § 7-707(a).

20. In addition, Section 7-709 of the Statute authorizes the City to apply for "a temporary closing order" sealing the subject premises without prior notice:

If, on a motion for a preliminary injunction pursuant to section 7-707 of this subchapter, the corporation counsel shall show by clear and convincing evidence that a public nuisance within the scope of this subchapter is being conducted, maintained or permitted **and that the public health, safety or welfare immediately requires** a temporary closing order, a temporary order closing such part of the building, erection or place wherein the public nuisance is being conducted, maintained or permitted may be granted without notice, pending order of the court granting or refusing the preliminary injunction and until further order of the court. Upon granting a temporary closing order, the court shall direct the holding of a hearing for the preliminary injunction at the earliest possible time but in no event later than three business days from the granting of such order; a decision on the motion for a preliminary injunction shall be rendered by the court within three business days after the conclusion of the hearing. [emphasis added]

21. Section 7-711(a) of the Statute states that

If on a motion for a preliminary injunction, the corporation counsel submits evidence warranting both a temporary closing order and a temporary restraining order, the court **shall** grant both orders. [Emphasis added].

5

22. Section 7-711 further states that

The officers serving a temporary closing order shall, upon service of the order, command all persons present in the building, erection or place to vacate the premises forthwith. Upon the building, erection or place being vacated, the premises shall be securely locked and all keys delivered to the officers serving the order who thereafter shall deliver the keys to the fee owner, lessor or lessee of the building, erection or place involved. If the fee owner, lessor or lessee is not at the building, erection or place when the order is being executed, the officers shall securely padlock the premises and retain the keys until the fee owner, lessor or lessee of the building is ascertained, in which event, the officers shall deliver the keys to such owner, lessor or lessee.

23. Upon service of the temporary closing order:

the officer shall post a copy thereof in a conspicuous place or upon one or more of the principal doors at entrances of such premises where the public nuisance is being conducted, maintained or permitted. In addition, where a temporary closing order has been granted, the officers shall affix, in a conspicuous place or upon one or more of the principal doors at entrances of such premises, a printed notice that the premises have been closed by court order, which notice shall contain the legend "closed by court order" in block lettering of sufficient size to be observed by anyone intending or likely to enter the premises, the date of the order, the court from which issued and the name of the office or agency posting the notice ... Mutilation or removal of such a posted order or such a posted notice while it remains in force, in addition to any other punishment prescribed by law, shall be punishable, on conviction, by a fine of not more than five hundred dollars or by imprisonment not exceeding ninety days, or by both, provided such order or notice contains therein a notice of such penalty. The police department shall, upon the request of the agency involved or upon the direction of the mayor, assist in the enforcement of this subdivision.

N.Y.C. Admin. Code § 7-711(e).

24. A temporary closing order or a temporary restraining order shall be vacated, upon notice

to the corporation counsel, if the defendant shows by affidavit and such other proof as

may be submitted that the public nuisance within the scope of this subchapter has been

abated.  *See* N.Y.C. Admin. Code § 7-711(e).

6

**STATEMENT OF FACTS**

**The NYPD Locked Ms. Bueno Out of Her Home Without Notice,
Based on Allegations Against a Previous Tenant With No Connection
to Ms. Bueno or Her Family**

25. Plaintiff AUSTRIA BUENO is the tenant at 41-06 12th Street, Apt. 4D, Long Island City, New York 11101, a public housing project known as the Queensbridge South, owned and administered by the New York City Housing Authority (NYCHA).

26. Ms. Bueno has lived in her apartment for less than a year. On or about August 1, 2015, she entered into a rental agreement with the NYCHA.

27. Plaintiff and her family—her husband and minor sons—reside in the subject apartment.

28. Ms. Bueno has worked as a housekeeper since December of 2013, and her husband works in a deli.

29. She applied for a NYCHA apartment over six years ago because it was extremely difficult to make ends meet at their prior one-bedroom apartment, where she paid $1,550.00 per month in rent.

30. The NYCHA two-bedroom apartment provided her with the ability to maintain a stable home—for $792.00 per month, especially since she was pregnant with her youngest son at the time of her application. Ms. Bueno was excited for her new apartment not only because it was affordable and more spacious, but because it is only 10-15 minutes away from her current job.

31. In or about December of 2015, when the City implemented its closing order against the subject premises, Ms. Bueno was home earlier that day cooking a meal for her family. She

7

then left the food in the oven before picking up her youngest son from elementary school. She later met her teenage son who attends the Art and Business school in Flushing.

32. However, when Ms. Bueno and her family returned, they found the City's closing order posted to the door. The sign stated that she could not re-enter her apartment. Therefore, she immediately called the police who said that they could not do anything.

33. Immediately afterwards, Ms. Bueno—frantically—called the NYCHA's management office to inform them of what happened. The manager sympathized with her because he knew that she recently moved in, but he told her that there was nothing he could do.

34. With no place to go, and since it was late at night and she did not have any options, Ms. Bueno and her family made reservations for the LaGuardia Plaza Hotel in Astoria and paid $208.00 for a one-night stay.

35. Instead of eating the meal Ms. Bueno prepared, the family purchased dinner from McDonalds.

36. The hotel was too expensive so, the next morning, Ms. Bueno and her family stayed with her mother-in-law in her two-bedroom apartment. She and her family of four slept on the living room floor on Saturday, Sunday, and Monday night before her court appearance on Tuesday, December 15, 2015.

37. Ms. Bueno works on the weekends, and she was forced to miss work on Saturday, Sunday, and Tuesday— she does not receive a salary, so the days she missed were deducted from her paycheck—because she did not have a change of clothes or the necessities that were locked in the apartment. Her husband also missed work. The entire family was scared, nervous and

confused about the situation; her youngest son could not attend school on Monday because he did not have his school uniform.

38. At some point during the weekend, Ms. Bueno had to purchase groceries, hot food, clothes, toiletries and other necessities.

39. The City's commencement of the proceeding, on or about December 11, 2015, pursuant to the Public Nuisance Law to seal Ms. Bueno's apartment was based on criminal activity that allegedly occurred in her apartment in January and February of 2015—ten months before the filing of the proceeding and six months before the date Plaintiff's family first moved into their apartment.

40. According to the state court complaint, an informant ("CI")

> [w]as searched and found not to be in possession of any illegal drugs or United States currency. The CI was then given buy money (U.S. Currency) for the controlled buy at the subject premises. The CI was observed as s/he walked in the direction of the subject premises building without stopping or talking to anyone. The CI subsequently handed Police Officer Moreno a quantity of crack cocaine purchased from a male individual known to the CI at the subject premises. The CI was searched once again and found not to be in possession of additional contraband.

41. The CI allegedly purchased illegal controlled substances from someone in the "direction" of the building known as 41-06 12th Street, Long Island City, New York 11101 on two occasions—January 23, 2015 and January 30, 2015.

42. The complaint further asserted that on February 6, 2015, the New York City Police Department ("NYPD") allegedly searched the subject premises because illegal controlled substances were being sold in apartment 4D, and the search uncovered controlled substances and weaponry.

43. According to the arrest report attached to the City's Order, Gerald Lewis, Cynthia Haynes, and Mary Haynes were individuals arrested as a result of the search on February 6, 2015. The City made no allegations concerning Ms. Bueno and/or her family, who of course, did not take occupancy of the apartment until on or about August 1, 2015.

44. Notwithstanding the passage of approximately ten months from the date of the search warrant, the vacatur of the tenants who resided in the apartment at that time, and the entry of a new family into possession, the City applied to the State court *ex parte* for an order immediately sealing the apartment and evicting its occupants.

45. In its application for the sealing Order, dated in June of 2015, the City set forth the boilerplate assertion that "the premises is currently being operated, occupied and used illegally. . . the Plaintiff has established a *prima facie* that the Defendants are maintaining a nuisance."

46. Additionally, the City claimed that "[i]n the case herein, there can be no doubt that the Defendants are permitting the subject premises to be used for drug trafficking. Indeed, the Plaintiff has established by clear and convincing evidence that the Defendants are maintaining a public nuisance."

47. The City's boilerplate affirmation also asserted that "the community and neighboring businesses have suffered severely, and continue to suffer, as a result of drug trafficking in the subject premises. The illegal activity is interfering with the health safety and well-being of those who live and work in the surrounding neighborhood, as well as local neighborhood business patrons. In addition, upon information and belief, drug enterprises such as that

operating out of the subject premises, are often the scene of and/or cause of violent crime, including shootings."

48. Additionally, in the City's request for a preliminary injunction, it claimed that it can succeed on the merits of its case because U.S. currency, paraphernalia and drugs were recovered from the subject premises in January and February of 2015, at least ten months before the filing of the Order. Second, that it could succeed because in the "legislative declaration incorporated into the Nuisance Abatement Law, the City Council recognized that any violation of the law deemed to be a public nuisance is, by definition, harmful to the public." Finally, that the "subject premises is currently being operated, occupied and used illegally. Thus, when the equities are balanced, the great benefit to the City of New York—and the public at large which is required to protect—of eliminating drug trafficking from the subject premises substantially outweighs any interest which Defendants may have in the subject premises."

49. The City goes on to say that the "criminal activity is persistent at the subject premises as evidenced by the numerous incidents. It is clear that a closing order is the only effective remedy to abate this serious public nuisance."

50. The Attorney's affirmation further states that "*a prima facie* showing that the Defendants are indeed violating the relevant law is sufficient to entitle the municipality to a preliminary injunction *pendent lite*."

51. Finally, the City asserts that "Given such disrespect for the law, the Plaintiff submits that an injunction alone will not be honored by those responsible for conducting and maintaining or permitting illegal activity. Thus, an order closing the subject premises against all use during

the pendency of this action is the best assurance that this persistent public nuisance will be abated."

52. Although the Verified Complaint was signed on May 21, 2015 and the Attorney's Verification on June 24, 2015, the City waited—without any explanation—until December 11, 2015 to present its application to the Queens County Supreme Court (the Attorney's Affirmation was signed on December 10, 2015).

53. The City took no action to verify whether there had been any changes in the occupancy of the apartment during the six months since it had prepared its court papers.

54. Upon information and belief, the City failed even to contact the NYCHA, public housing authority administering the subject building, to ascertain the identity of the current occupants and their connection, if any, with the events in February of 2015.

55. Therefore, the statements in the City's court papers, although they might possibly have been true when they were sworn to in June 2015, were clearly and demonstrably false at the time they were presented to the State court by the City's Law Department in December 2015.

56. In its December application, the City failed to allege that any criminal or nuisance conduct had occurred since Ms. Bueno and her family took possession on August 1, 2015.

57. In the City's application for a temporary closing order, Corporation Counsel failed to apprise the judge that the current residents consisted of a mother, her husband, their teenage son and minor child. Indeed, the application made no mention of the occupants at all.

58. Based on the misleading, incomplete and inaccurate information submitted by Corporation Counsel, on December 11, 2015, the Hon. Orin Kitzes authorized the immediate sealing of Ms. Bueno's apartment and enjoined its use or occupancy, pending a hearing to be held on December 15, 2015.

59. Because the City's Public Nuisance Law allows for the *ex parte* eviction of residential tenants without giving them a prior opportunity to be heard in court, Plaintiff was given no prior notice regarding the City's application to the court and had no chance to explain to Judge Kitzes that she was a new tenant of the apartment with no connections to the prior occupants and their illegal activities.

60. Upon information and belief, if Plaintiff had been able to appear in the State court and provide such information to the judge, the court would never have signed an order sealing her apartment.

61. The Order of the Queens County Supreme Court directed that Ms. Bueno be enjoined from the use and/or occupancy of her apartment for any purpose whatsoever. The Order further stated that the subject premises "shall be closed" and that the police were authorized to use force to "effectuate" the closing order.

62. The Order asserted that, pursuant to Section 7-706(h) of the Administrative Code, the City is entitled to a judgment against the "Defendants" ordering that each "Defendant" pay a penalty of one thousand ($1,000) dollars for each day that such "Defendant" intentionally conducted, maintained or permitted the public nuisance.

63. Ms. Bueno her family did not have a place to stay until Tuesday, December 15, 2015, the date of her after-the-fact court appearance. She was distraught and frantic.

64. On Monday, December 14, 2015, Ms. Bueno visited the Queens County Supreme Court to inform them that she did not take part in any of the allegations; in fact, she recently moved into the apartment on August 1, 2015. However, the clerk informed her that she would have to wait until the next day, when she was scheduled for her court appearance.

65. Subsequently, Plaintiff retained Queens Legal Services as counsel.

66. On Tuesday, December 15, 2015, Ms. Bueno and her legal representatives appeared in Queens County Supreme Court to request that the City discontinue the proceeding.

67. That same day, Ms. Bueno was permitted to regain possession of the subject premises, and the State court action was adjourned to December 23, 2015 for Ms. Bueno to provide her lease agreement so the City could verify that she did not live in the apartment at the time of the alleged incident.

68. After receiving the faxed lease, instead of withdrawing or discontinuing the proceeding, the City insisted that Ms. Bueno sign a stipulation of discontinuance waiving her claims against the City.

69. Ms. Bueno refused because she suffered greatly from the City's actions.

70. Because the City refused to discontinue the State court action unless Ms. Bueno agreed to waive her damage claims, Ms. Bueno's counsel filed opposition papers asserting that the case should be dismissed because neither Ms. Bueno nor the occupants were involved in the alleged incidents.

71. The City informed Ms. Bueno's counsel that it needed an adjournment to respond to her court papers.

14

72. Before the next court date, the City requested an adjournment for March 16, 2016 because the City was reviewing the way it handles public nuisance cases.

73. On or about March 16, 2016, the City withdrew its complaint.

74. Ms. Bueno continues to live in fear that the NYPD may lock her and her family out of their home again.

### New York City Unlawfully Targets Communities of Color
### Through Illegal Nuisance Abatement Lockouts

75. Plaintiff's experience was not an isolated occurrence.

76. New York City, as a pattern and practice, regularly seeks *ex parte* evictions of residential tenants in all five boroughs of New York, and regularly submits misleading statements to the State court suggesting that criminal activity has continued through the date of the application for a sealing order when in fact all such activity had ceased months earlier.

77. Moreover, the City, as a pattern and practice, applies for *ex parte* sealing orders without accurately advising the State court of the identity of the current occupants of the subject apartment, their connection, if any with the participants in the alleged nuisance, and whether the occupants include children, the elderly, or the disabled.

78. For example, in Queens County, in the months of January 1, 2016 through March 31, 2016, the City commenced twenty-four actions to obtain sealing orders in Queens County Supreme Court requesting that the court debar residential tenants from their homes. In these cases, the average delay between the last alleged criminal incident and the filing of the "emergency" Orders to Show Cause and verified complaints was five months, yet in each case the City claimed that due to ongoing criminal activity, the court must enter an *ex parte* eviction order

15

without waiting even three days for the tenant to appear on the return date of the City's Order to Show Cause.

79. Similarly in Kings County, from January 1, 2016 through March 31, 2016, the City sought public nuisance sealing orders against residential properties and residents. The average delay between the last listed criminal incident and the filing of the "emergency" Orders to Show Cause was 5.67 months, yet the City alleged that the "emergency" was too great to allow the tenants their day in court before executing the Orders.

80. Based on the incomplete, inaccurate, and misleading information provided by the City, and the residents' inability to present their side of the facts in court, the State court judges are unable to meaningfully weigh the potential harms and benefits of granting *ex parte* injunctive relief. In the Kings County cases in 2016, *ex parte* orders were granted in nine of sixteen applications; in Queens, *ex parte* orders were granted in twenty-one of twenty-four applications.

81. This process has been documented in the news media. In partnership with the investigative journalism website ProPublica and the New York Daily News reviewed 516 residential nuisance abatement actions filed in the Supreme Courts over a recent 18-month period. They found that over 90% of nuisance abatements occurred in minority communities.[3]

---

[3] *See* Sarah Ryley, *The NYPD Is Kicking People Out of Their Homes, Even If They Haven't Committed a Crime*, Pro Publica and the New York Daily News (Feb. 4, 2016), https://www.propublica.org/article/nypd-nuisance-abatement-evictions; *see also*, Sarah Ryley, *Insiders Say NYPD's Nuisance Unit Skirts the Law and Relies on Unconfirmed Allegations*, Pro Publica and the New York Daily News (Mar. 25, 2016), https://www.propublica.org/article/insiders-say-nypd-nuisance-unit-skirts-law-unconfirmed-allegations.

### FIRST CAUSE OF ACTION
### THE CITY'S PUBLIC NUISANCE LAW IS
### UNCONSTITUTIONAL AS APPLIED

82. The City's use of the Nuisance Abatement Law to obtain an *ex parte* order sealing a residential public housing apartment whose occupants were a mother, father, and two minor children who had engaged in no criminal activity violated the Due Process Clause of the U.S. Constitution.

83. The egregious circumstances set forth above vividly illustrate the extreme risk of erroneous deprivation that arises from the City's procedures, and the weakness of the City's interest in evicting families without waiting even three days for a court hearing at which the residents of the subject apartment can be heard judge.

84. Plaintiff is entitled to a declaration that the NYC Nuisance Abatement Law therefore violates the Due Process Clause of the U.S. Constitution as applied in the circumstances of Ms. Bueno's case.

85. As a result of the City's violation of Ms. Bueno's Due Process rights, Plaintiff and her family suffered humiliation, anguish and emotional distress, and incurred monetary expenses, which entitle them to damages under 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION
### THE CITY'S PATTERN AND PRACTICE OF SEEKING EX PARTE
### EVICTIONS  VIOLATES THE DUE PROCESS CLAUSE
### OF THE U.S. CONSTITUTION

86. The City, as a pattern and practice, regularly seeks *ex parte* eviction orders against residential tenants where no criminal activity has occurred for several months prior to the City's applications.

87. In such applications, the City regularly misrepresents to the State courts that criminal activity has continued up to the date of the application for a sealing order, when in fact no such activity had occurred for ninety days or more, or the City has no knowledge of any such activity.

88. In such applications, the City regularly fails to apprise the State court of the identities of the occupants of the residential apartment, and in particular, whether those occupants include children, the elderly or the disabled.

89. Plaintiff is entitled to a declaration that the City's pattern and practice violates the Due Process Clause of the U.S. Constitution, for which a cause of action is provided under 42 U.S.C. § 1983.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a final judgment pursuant to 28 U.S.C. §§§ 1331, 1343(3) and 1337 of the Federal Rules of Civil Procedure:

(1)     declaring that the NYC Nuisance Abatement Law violates the Due Process Clause of the U.S. Constitution as applied in the circumstances herein;

(2)     declaring that the City's practice of seeking ex parte evictions of residential tenants violates the Due Process Clause of the U.S. Constitution.

(3)     awarding Plaintiff damages in an amount to be determined at trial; and

(4)     granting such other and further relief as the Court may deem just and proper.

Dated: April 12, 2016

Respectfully submitted,

ROBERT SANDERMAN, ESQ
ANN BIDDLE, ESQ
EDWARD JOSEPHSON, ESQ
**QUEENS LEGAL SERVICES**
89-00 Sutphin Boulevard, 5th Floor
Jamaica, New York 11435
Phone: (347) 592-2217
Email: rdsanderman@lsnyc.org
Attorneys for Plaintiff